**STATE of Missouri, Respondent,**

v.

**Willie James MOSS, Appellant.**

**No. 46707.**

Supreme Court of Missouri,

Division No. 1.

Oct. 13, 1958.

James C. Morris, E. L. Simmons, Howard D. Lay, Kansas City, for appellant.

John M. Dalton, Atty. Gen., J. Burleigh Arnold, Asst. Atty. Gen., for respondent.

HYDE, Presiding Judge.

Defendant has appealed from conviction of robbery in the first degree and sentence of five years in the penitentiary. The only point raised is that the Court erred in overruling defendant's motion for judgment of acquittal. This is based on the claim that there was insufficient evidence to make a jury issue as to the identity of defendant as one of the two men who participated in the robbery.

It was charged that defendant robbed James B. Shields, 70 years old. According to the State's evidence, Mr. Shields drove to Kansas City, where he lived, on Saturday night, June 29, 1957, from the farm he owned in Clay County and went to McKinney's Bar, on 18th Street, near the Paseo. He thought the time was about 10:00 P.M. He ordered a pint of beer and sat down at a table by himself to drink it. He had not had anything else to drink prior to that time and did not drink anything more. A colored man he had never seen before came over and asked him to buy some beer for him. The man had on a dark shirt with white stripes running down the front.

Shields paid for the beer with a five dollar bill and received four one dollar bills and some change, which he put in his pocket. He then talked to a friend from Liberty and to a special officer (Sherman McHenry), got a couple of half-pints of gin, put both in a paper sack and started for his car. He walked on 18th Street to Paseo and when he turned the corner he discovered someone walking right behind him. He recognized him as the colored man with the striped shirt he had seen in the tavern, wheeled and stepped off the sidewalk to go back, when another man ran into him, grabbed him and tore his shirt. Both of his gin bottles fell on the sidewalk and broke. There was a bright light at the corner and other lights up and down the street. He then testified thus as to the identity of the man who grabbed him:

"Q. Now, would you know that man if you would see him again? A. Yes, sir, I certainly would.

"Q. Do you see him in the courtroom? A. Yes, sir.

"Q. Would you point him out to the Court and jury, please? A. It's the man sitting in the chair there (indicating)."

*   *   *   *   *   *

"Q. Is this the man that held you up, took your money from you? A. Yes, sir.

"Q. Any question in your mind about it? A. Not any; positive."

Shields further testified:

"Q. What did you observe about this defendant? A. Well, one thing he had, on the right-hand side of his face, he had quite a long bunch of hair sticking down, just in one spot.

"Q. You are speaking about just lower than the mouth on the right chin, is that right, sir? A. I would think it was near the chin.

"Q. Was this a white man or a colored man? A. He was a colored man.

"Q. Was he wearing a hat? A. It seemed that he just had a big bushy head of hair.

"Q. Big bushy head of hair? A. That's right.

"Q. Was his hair long or was it short? A. Long, it was long.

"Q. Anything unusual about his face? A. Well, I noticed he had kind of a round face with very thick lips."

Shields said defendant was facing him when he grabbed him and twisted his right arm. He did not resist and told defendant to take his money because he was afraid the other man would hit him. Shields said: "He walked off with the billfold and had it up, holding it in the light, taking the money out, and I said, 'Will you please let me have my billfold?' and he said, 'Yes.' I walked up and he handed me my billfold. * * * He told me I had better get to hell down the street, that he would punch me full of holes. * * * They went down the alley and back west." Shields went back to the tavern and told the special officer what had happened. The man with the striped shirt came back there and was arrested. Shields saw defendant again three days later, with two other colored men, "at the show-up down at police headquarters". He said: "I identified the man right immediately."

On cross-examination, Shields said he wore glasses to read and further testified: "Q. Now you testified that you just saw this defendant close up. Is it possible that without your glasses you might be mistaken? A. Certainly. Certainly. Q. It is possible? A. Sure." However, on re-direct he further testified as to defendant's identity: "Q. Are you positive this is the man who robbed you? A. Yes, sir."

Special officer McHenry said he went on duty at 9:00 P.M. on June 29, 1957, and saw Shields when he came on duty and later Shields complained to him "a man was annoying him". He said: "a short time after he had bid me goodnight, in a matter of minutes, * * * he came back with his shirt all tore and complained to me that he had been robbed." McHenry said he called the police and the man that had previously been annoying Shields was arrested. Police officer Wescott said Shields picked out defendant at the police show-up and "stated he was the man that was one of the two that strong-armed him on the night of June the 29th." Wescott said: "I asked Mr. Shields how he identified the defendant Moss, he stated by his facial features, his physical build, and the fact that he had a small mustache or goatee, as he called it, on the side of his face. * * * On the right side of his face."

Defendant, who lived over the McKinney Bar, testified in his own behalf and denied he robbed Shields. He said he was at a place on 12th Street on the night of June 29, 1957, and it was around 2:30 A.M. when he got back to 18th Street.

Defendant argues that the other two men in the show-up with defendant were lighter in color and did not fit the description given by Shields. He also says Shields was a man of advanced years, with a poor memory, apparently could not see very well, and probably was under the influence of alcohol when he was robbed by two men he had never seen before. However, this is a very strained and extremely unfavorable view of the evidence, which no doubt was presented to and rejected by the jury, who saw Shields, heard his testimony and observed his characteristics, manner and demeanor. It is emphasized both that the identification by Shields was uncorroborated and that he said he could be mistaken; and argued that this admission completely destroys his identification of defendant and leaves the State without any substantial evidence to connect defendant with the robbery. We have set out the questions and answers relied on by defendant, and it is apparent that more than one construction of Shields' answers as to the possibility of mistake would be reasonable,

especially in view of the positiveness of his identification of defendant both before and after this cross-examination. Shields certainly was positive that he was not mistaken. The accuracy and credibility of his testimony was for the jury to determine if it was of any probative value.

It is of course true, as defendant contends, that testimony which is inherently incredible, self-destructive and opposed to physical facts is not substantial evidence and will not be held sufficient to support a verdict, and this Court will not let a verdict stand which is not supported by substantial evidence. Defendant cites State v. Jones, 71 Mo. 591, in which it was held the State failed to identify the defendant as the man who sold a stolen mare. However, the purchaser testified that "he looks like the man but could not swear that he was the man." Another witness for the State said of the man, who sold the horse: "He looked some like the defendant, but I don't believe defendant was the man." It was shown that defendant had an older brother, heavier but not so tall, who had left the state soon after the mare was stolen; and that the brothers resembled each other, "both have sandy hair and whiskers and are of red complexion." The court said: "Considering the resemblance between the brothers * * * and the refusal of any witness to state that defendant was the man who sold the mare to Brown, the defendant was entitled to an acquittal." For cases in which identification was held to be sufficient see State v. Franke, 159 Mo. 535, 60 S.W. 1053; State v. Harmon, Mo.Sup., 296 S.W. 391, 397; State v. Zammar, Mo.Sup., 305 S.W. 2d 441, 446. In this case, Shields described the conditions, light, his closeness to the men who robbed him, his opportunity to observe them, both during and after the robbery, and he gave the police the description of defendant from which he was arrested. His identification of defendant was positive both at the police show-up and at the trial. Our conclusions are that, although Shields' answers concerning the possibility of mistake were factors to be considered by the jury in making its findings as to defendant's presence and participation in the robbery, they did not destroy the probative value of his testimony as to defendant's identity; and that his testimony considered in its entirety was sufficient substantial evidence to support the jury's finding.

We have examined the record and find no error respecting the sufficiency of the indictment, verdict, judgment and sentence.

The judgment is affirmed.

All concur.